## No. 2329
### Second Circuit Appeal

### BENJAMIN T. SIMMONDS v. AUSTIN OIL COMPANY

(June 23, 1925, Opinion and Decree)

*(Syllabus by the Editor.)*

1. **Louisiana Digest—Master and Servant— Par. 160 (j).**
A doctor's prediction as to when an injured hand will recover amounts to little or nothing as opposed to testimony given six months thereafter, showing, contrary to the prediction, that it had not recovered.

2. **Louisiana Digest—Master and Servant— Par. 159, 159 (a).**
Where the evidence in a Workmen's Compensation case under Act No. 20 of 1914, clearly shows that the earning capacity of the injured employee has been decreased by the accident he is entitled to compensation during the period of disability not to exceed 300 weeks under Section 8 Subsection 1 (c), Act 20 of 1914.

3. **Louisiana Digest—Master and Servant— Par. 160 (l); Appeal—Par. 512.**
Damages will only be allowed for a frivolous appeal where the appeal is suspensive. Therefore, a devolutive appeal in a compensation case cannot be considered one on which to give damages as for frivolous appeal.
(See Code of Practice, Art. 907. Editor's note.)
(The recent amendment of Section 8 of Act 20 of 1914, is Act 216 of 1924.)

Appeal from First Judicial District Court of Louisiana, Parish of Caddo, Hon. T. F. Bell, Judge.

This is a suit brought by an injured employee for compensation under the Workmen's Compensation Act, No. 20 of 1914, as amended by Act 43 of 1922.

There was judgment for plaintiff and defendant appealed. Judgment affirmed.

Long & Crow, of Shreveport, attorneys for plaintiff, appellee.

John B. Files, of Shreveport, attorney for defendant, appellant.

CARVER, J. Plaintiff, an electrical worker, 44 years old, sues for compensation under the Workmen's Compensation Act and its amendments (Act No. 20 of 1914, as amended by Act No. 43 of 1922) for 300 weeks for injuries alleged to have been received in an accident arising out of and in the course of his employment by the defendant.

The answer is general denial.

The District Judge allowed $18 a week during disability, not to exceed 300 weeks.

Defendant appeals, and plaintiff asks damages for frivolous appeal.

Plaintiff describes the accident as follows:

"I attempted to open a switch on a 550-volt circuit and did so and my foot slipped off the board in the building for a floor, only one board there, and I fell about fourteen inches down and fumbled the switch, and there was a flash immediately and burned my hand along in here, burned this nail and it came off."

He further states that his wages were $200 per month, besides water, gas, light and the use of a house, and occasional use of an automobile. Also that he had not been able to hold a job since the accident. That his occupation requires careful work with the injured hand, the right; that it is now useless; that in doing armature work the wires have to be placed very carefully, demanding the use of the ends of the fingers; that he can do some electrical work with the left hand but not much; that since the accident, June 19, 1924, to the time of the trial, December 12, 1924, he "had worked about 30 days; 15 days picked up odd jobs"; had not had regular position but only little repair jobs; had earned about $100 during that time; that his hand and arm tingled up to the elbow; that he is right-handed; that he was treated by Dr. Collins from June 19 to August 1; that he worked for defendant for thirty days after the accident; that he could have gotten work in Shreveport but was not able to do it; that he drew salary from Austin Oil Company from the time of his employment—four or five months before the accident—until he left there, about the first day of August; that there was nothing wrong with his arm or right hand before the accident; that he could do all kinds of electrical work before that and had done so for twenty years; that now he cannot handle a small screwdriver with any accuracy, and cannot do the work in relaying.

As to his discharge, he says that Mr. Austin, one Sunday before the first day of August, "called me to the office and told me after the first he would not need my services any more; I suppose I disagreed with the way he handled things, or wished for me to handle things there, not particularly my view of it, no particular trouble."

"Q. A disagreement about the handling of the business between you and Mr. Austin?

"A. Well, I discussed with him what I wanted to do regarding changes around in the plant and over the refinery tanks, told him that I would like to go ahead with the work, and he just give me two or three men to go ahead and do the work, and he treated me with absolute arrogance, ignored me."

He says this was a few days before the first of August.

Dr. J. D. Young was appointed by the court on the day before the trial to examine the plaintiff and made his report, which is as follows:

"A man of good physical health, with no mental disturbance of any type, normal in every way with the exception of the extensor tendons of right hand. Over an area extending from just below the level of the wrist to the ends of all four fingers of this hand there is some atrophy of the small interosseous muscles with wasting of

the extensor tendons over this area, both superficial and deep. The tendons also show some adhesions which prevent their normal contraction and extension, producing to a marked degree disability in the use of these four fingers and hand. Over the distal area of these fingers there is absolutely no response to electrical stimulae, a loss of feeling. The tendons show the first degree of nerve degeneration supplying this area, little or no response to ferradic with only slight response to galvanic current. The normal hand shows contractions at 15 volts and 5 milliamperes. The injured hand responds only at 40 volts and 15 milliamperes. From the above I would conclude that this hand can be said to be negligible regarding the performance of any work requiring perfect co-ordination of muscles and that, as a result of the loss of sensation in the distal areas, the patient could easily unintentionally greatly suffer some damage of a serious nature when attempting to do electrical repair work. Condition permanent."

Doctor Young also testified as a witness:

"Regarding complete recovery, I think the chances are against it. This man I do not think will ever be much improved from the present condition, if any. The nerve, the peripheral nerve once destroyed by electricity, does not regenerate. I think that this man's condition will be permanent with him, that he will be unable to do a fine type of work, with this hand, that requires ability to grasp and hold small objects, with any proficiency."

He further testified that plaintiff lacked co-ordination of muscles; that co-ordination would likely not come back; that he also had a loss of sensation from the tips of the fingers; this he ascertained by testing him, "testing with different little things, then tapping him with the electric current, with his head turned, and there was no resistance or jerk when I applied a rather strong stimulant to the tips of the fingers."

He states that he did not make his diagnosis from what the plaintiff told him but from his own examination; that plaintiff could do no fine work requiring the use of small instruments and at the same time requiring muscular strength and power; that one with plaintiff's type of partial paralysis could not use a small screwdriver; that plaintiff had contraction of the tendons of all four fingers; that the contraction of the first finger is noticeable on examination but more easily determined by the electrical apparatus; that exercising the hand would not necessarily make it improve; that if the adhesion could be broken down by exercise the contraction would improve, but it is not possible to bring back the degenerated nerves; that he could not tell that the burn was from the electricity except from what plaintiff told him; that the loss of sensation was confined to the tips of the fingers and from the dorsal surface only.

Asked:

"Is it always possible, Doctor, to determine accurately and definitely the extent of an injury to a man's nervous system?"

He answered:

"Fairly accurately. We are able to locate lesions, and what nerves are involved, and what nerves are injured, whether motor or sensatory nerves."

He further states that nothing was wrong with the nerves or muscles of plaintiff's arm above the wrist.

* * * *

"Q. I will ask you, Doctor, if that condition would have anything to do with his inability to perform electrical work?

"A. That would not, but the condition of the loss of sensation in the tips of the fingers, and we have certain types and conditions of nervous condition where the patient has lost the sensation as to heat or cold, and you can place those parts in boiling water and they do not feel it, and

here, not being able to receive sensation in the tips of the fingers, it would be possible to receive an electrical shock, when if in good condition would possibly have detected it.

"Q.    On account of the loss of sensation?

"A.    Yes, sir.

"Q.    You tested the sensation with forty volts?

"A.    Yes, sir, no sensation there, could get no sensation there, got contraction of the tendons below there.

"Q.    How far does the loss of sensation extend?

"A.    Just the tips of the fingers, about half of one-quarter of an inch from the end."

## OPINION

Defendant argues that plaintiff's demand is absurd; that the injury was only trivial, and that he is shamming. He does not, though, undertake to contradict either the plaintiff's testimony or that of Doctor Young, who were the only two witnesses sworn.

. · On the day of trial, prior to the opening of it, it was agreed that the testimony of Doctor Collins might be taken out of court the following Wednesday. It was not so taken, though, but a report made by Doctor Collins dated July 30, 1924, was introduced in evidence.

This statement shows that, in the opinion of Doctor Collins, plaintiff was able to return to work about August 1, 1924; that he was capable of doing the same work as before the accident; that the nature and extent of the injury were: "Burn of face and hand caused by electric spark. The burn was of first and second degree." That the injury would not be permanent and "finger will be stiff for a while; should be able to use hand satisfactorily by August 10, 1924." ·

The report further shows daily office treatment from June 20 to July 3, and treatment during July on the 5th, 8th, 16th and 20th.

This report was made on a printed form.

Defendant argues that Doctor Young never makes a positive statement; that his testimony is purely theoretical, and that he uses the words, "most likely."

We do not construe Doctor Young's evidence as uncertain in respect of plaintiff's condition. The words, "most likely," were only used in connection with the doctor's statement as to the kind of burn plaintiff had received, viz., from electricity. He admitted he could not tell except from what plaintiff said. The kind of burn, though, is established by plaintiff's testimony and by Doctor Collins' report.

Doctor Young's testimony is not uncertain as to the atrophy of the interosseous muscles; as to the wasting of the extensor tendons, superficial and deep; as to the adhesions, preventing normal contraction and extension; these producing to a marked degree disability in the use of the four fingers and the hand.

Nor is he uncertain as to the loss of sensation in the tips of the fingers or as to nerve degeneration or want of muscular co-ordination.

The difference between the report of Doctor Collins and the report and testimony of Doctor Young is that the former states what Doctor Collins thinks will take place thereafter, whereas the latter states what did take place.

A doctor's prediction as to when an injured hand will recover amounts to little or nothing as opposed to testimony given six months thereafter, showing, contrary to the prediction, that it had not recovered.

Plaintiff admits that he has some use of the hand, but the proof convinces us that its condition is such as to impair very seriously his ability to do the kind of work which for twenty years has been his occupation.

. It also shows that, except for the time he worked for the defendant between the date of the injury and the 1st of August, when he was discharged, he earned only about $100.

We are satisfied that his earning capacity has been decreased more than $30 per week, and it was evidently on this basis that the lower court allowed compensation of $18 per week, being 60% of $30.

It is not shown exactly when he did resume work for the defendant after the accident, but the impression we get from the testimony is that very likely he did not suspend at all but that his work was not of the same kind as it had been, being merely in the nature of supervision.

He says (page 7):

"When did you return to work?
"I stayed there on the job until the 1st of August, not being able to do anything, just superintend the work."

As to plaintiff's motion for damages for frivolous appeal, this cannot be allowed. The appeal was not suspensive. Chaffe vs. Carroll, 35 La. Ann. 116; C. P. 907.

For these reasons the judgment of the lower court is affirmed.